UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

**RONALD JOSLYN,**

**Plaintiff,**

**-vs-** **Case No. 6:04-cv-1022-Orl-28JGG**

**JO ANNE B. BARNHART,**
**Commissioner of Social Security,**

**Defendant.**

---

**REPORT AND RECOMMENDATION**

Plaintiff Ronald Joslyn ["Joslyn"] appeals to the district court from a final decision of the Commissioner of Social Security [the "Commissioner"] denying his application for a period of disability, disability insurance benefits, and supplemental security income. *See* Docket No. 1 (complaint). For the reasons set forth below, the Commissioner's decision should be **AFFIRMED**.

## I. PROCEDURAL HISTORY

On December 18, 2000, Joslyn filed claims for disability insurance benefits and supplemental security income, claiming disability as of November 30, 2000. R. 99, 460. On February 10, 2003, the Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a hearing on Joslyn's claim in Orlando, Florida. Joslyn testified, and his attorney, J. Michael Matthews, appeared with him at the hearing. The ALJ also heard testimony from Vocational Expert ["VE"] Robert D. San Filippo. R. 495-528.

On April 22, 2003, the ALJ ruled that Joslyn was not entitled to benefits. R. 39-46. The ALJ found, *inter alia*, that Joslyn retained the Residual Functional Capacity ["RFC"] to perform a

significant range of sedentary work. R. 45, Finding 7. Accordingly, the ALJ applied Medical-Vocational Guidelines ["Grids"] Rule 201.25 as a framework for decision-making, which directed a finding of not disabled. R. 46, Findings 12, 13.

Joslyn timely appealed the ALJ's decision to the Appeals Council. R.79. On May 30, 2003, the Appeals Council vacated the ALJ's decision and remanded the case to the ALJ. R. 81-84. In its remand order, the Appeals Council noted, in relevant part:

> the hearing decision [citation omitted] indicates that the claimant has the residual functional capacity for . . . less than a full range of sedentary work. . . . In reaching this conclusion, the Administrative Law Judge appears to assign great weight to an examining source opinion . . . dated October 6, 2001 [citation omitted]. The decision and the medical source opinion, however, are unclear as to specific work-related limitations the claimant has incurred as a result of his carpal tunnel syndrome, including activities involving repetitive motion of the hands or fingers, with the conclusion that the claimant can **possibly** engage in upper body movements. The hearing decision also does not contain a [sic] evaluation of non-examining source opinions that the claimant can perform up to light work activities or a report from a vocational consultant that indicates the claimant is precluded from working in any and all work groupings.
>
> The hearing decision [citation omitted] indicates that the claimant has a mental impairment, but does not reflect an adequate evaluation of its severity or effects pursuant to 20 C.F.R 404.1520a and 416.920a and does not identify pertinent "B" and "C" criteria ratings.

R. 82-83. Therefore, the Appeals Council directed the ALJ to: 1.) give further consideration to Joslyn's RFC and, if appropriate, request the examining source to provide additional evidence or clarification about what Joslyn can still do despite the impairments; 2.) further evaluate Joslyn's mental impairment; and 3.) obtain evidence from a vocational expert. R. 83.

On October 20, 2003, the Honorable Philemina M. Jones held a supplemental hearing on Joslyn's claim in Orlando, Florida. R. 463-94. Joslyn testified. His attorney, J. Michael Matthews, appeared with him at the hearing. The ALJ also heard testimony from VE Susanna D. Roche.

On November 20, 2003, the ALJ issued her decision that Joslyn was not entitled to benefits. R. 16-24. Following a review of the medical and other record evidence, the ALJ found that, although Joslyn has severe impairments, he does not have an impairment or combination of impairments that meets or equals a listed impairment. R. 23, Findings 3-4. The ALJ also found that Joslyn's allegations regarding his limitations were not fully credible. R. 23, Finding 5. Further, the ALJ determined that Joslyn could not perform his past relevant work, but retained the RFC to perform a reduced range of sedentary work.[1] R. 23, Findings 7-8. Accordingly, the ALJ applied Grids Rules 201.25 and 201.19 as a framework for decision-making, and relied on VE testimony to determine that Joslyn was not disabled. R. 24, Findings 13-14.

Joslyn timely appealed the ALJ's decision to the Appeals Council. R. 11. Finding no error or abuse of discretion, the Appeals Council denied review on May 7, 2004. R. 8-10. On July 7, 2004, Joslyn timely appealed the Appeals Council's decision to the United States District Court for the Middle District of Florida. Docket No. 1. On March 10, 2005, Joslyn filed a memorandum of law in support of his appeal of the denial of review. Docket No. 19. On May 9, 2005, the Commissioner filed a memorandum in support of her decision that Joslyn was not disabled. Docket No. 21. The appeal is ripe for determination.

## II. THE PARTIES' POSITIONS

Joslyn assigns four errors to the Commissioner's decision: 1.) finding that Joslyn did not have a severe mental impairment; 2.) posing a hypothetical question that was not supported by substantial

[1] "Sedentary work" involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if walking and standing are required occasionally and other sedentary criteria are met. 20 C.F.R. § 416.967(a).

evidence; 3.) improperly evaluating Joslyn's subjective complaints of pain; and 4.) failing to fully develop the record by not ordering a consultative psychological examination. Pl.'s Brief at 7-16.

The Commissioner responds that her decision was supported by substantial evidence and was decided by proper legal standards. The Commissioner asserts that: 1.) the ALJ correctly determined that Joslyn had no severe mental impairments; 2.) the hypothetical questions were based on substantial evidence; 3.) substantial evidence did not support Joslyn's allegations of disabling pain; and 4.) the ALJ was not required to order a consultative examination. Def.'s Brief at 4-20.

## III. <u>THE STANDARD OF REVIEW</u>

### A. <u>Affirmance</u>

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g). Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable

as well as unfavorable to the decision. *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

**B. Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause. 42 U.S.C. § 405 (g)(Sentence Four). The district court will reverse a Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21 F.3d 1064, 1066 (11th Cir. 1994); *accord, Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir. 1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990). This Court may reverse the decision of the Commissioner, and order an award of disability benefits, where the Commissioner has already considered the essential evidence and it is clear that the cumulative effect of the evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993); *accord*, *Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

The district court may remand a case to the Commissioner for a rehearing under sentence four of 42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences. *Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996). To remand under sentence four, the district court must either find that the Commissioner's decision is not supported by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the disability claim.

*Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d 688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was insufficient for district court to find claimant disabled).

Where the district court cannot discern the basis for the Commissioner's decision, a sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30 (11th Cir. 1984) (remand was appropriate to allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment). On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence. *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation). After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction. *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g). To remand under sentence six, the claimant must establish: 1.) that there is new, non-cumulative evidence; 2.) that the evidence is material — relevant and probative so that there is

a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level. *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the Commissioner if new, material evidence becomes available to the claimant. *Jackson*, 99 F.3d at 1095. With a sentence-six remand, the parties must return to the district court after remand to filemodified findings of fact. *Jackson*, 99 F.3d at 1095. The district court retains jurisdiction pending remand, and does not enter a final judgment until after the completion of remand proceedings. *Id*.

## IV. THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months. 42 U.S.C. §§ 416 (I), 423 (d)(1); 20 C.F.R. § 404.1505. The impairment must be severe, making the claimant unable to do his or her previous work, or any other substantial gainful activity which exists in the national economy. 42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A. Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a treating physician unless there is good cause to do otherwise. *See Lewis v.* Callahan, 125 F.3d 1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991); *Sabo v.*

*Commissioner of Social Security*, 955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. § 404.1527 (d). If a treating physician's opinion on the nature and severity of a claimant's impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight. 20 C.F.R. § 404.1527 (d)(2). The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory. *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments. *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987). When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion. 20 C.F.R. § 404.1527 (d). However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion. *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled. However, the ALJ is responsible for making

the ultimate determination about whether a claimant meets the statutory definition of disability. 20 C.F.R. § 404.1527 (e). The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner. 20 C.F.R. § 404.1527 (e).

**B. Developing the Record**

The ALJ has a duty to fully and fairly develop the record. *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981). The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right. *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734. The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel. *See Cowart*, 662 F.2d at 735 - 36. However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty. *See Joslyn v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982). This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

**C. Medical Tests and Examinations**

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled. 20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986). In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision. *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error). Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary. 20 C.F.R. § 416.917 (1998).

**D. The Five Step Evaluation**

The ALJ must follow five steps in evaluating a claim of disability. *See* 20 C.F.R. §§ 404.1520, 416.920. First, if a claimant is working at a substantial gainful activity, she is not disabled. 20 C.F.R. § 404.1520 (b). Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled. 20 C.F.R. § 404.1520 (c). Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled. 20 C.F.R. § 404.1520 (d). Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled. 20 C.F.R. § 404.1520 (e). Fifth, if a claimant's impairments (considering his or her residual functional capacity, age, education, and past work)

prevent him or her from doing other work that exists in the national economy, then claimant is disabled. 20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process. 42 U.S.C. § 423 (d)(2)(B). The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993). Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled. *See id.*, 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act. *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991). The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits. *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), ©). If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability. *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

**E. <u>The Evaluation of Mental Disorders</u>**

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such

impairment may impose on the individual's ability to work. The listings for mental disorders are arranged in eight diagnostic categories. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work. A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings. 20 C.F.R. § 404.1526. An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity. The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment. Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning; concentration, persistence, or pace; and ability to tolerate increased mental demands associated with competitive work). A "marked" degree of limitation means more than moderate, but less than extreme. A marked limitation may arise when several activities or functions are impaired or even when only one is impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently,

appropriately and effectively. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The technique is used in connection with the sequential evaluation process. *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning; concentration, persistence and pace; or ability to tolerate increased mental demands (stress). This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports. It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor. Proper evaluation of the impairment must take any variations in level of functioning into account in arriving at a determination of impairment severity over time. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Thus, it is vital to obtain evidence from relevant sources over a sufficiently

long period prior to the date of adjudication in order to establish the individual's impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1. This evidence should include treatment notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these are available. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Some individuals may actually have worked during the period of time pertinent to the determination of disability. Information concerning the individual's behavior during any attempt to work and the circumstances surrounding termination of the work effort are particularly useful in determining the individual's ability or inability to function in a work setting. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals who have long histories of repeated hospitalizations or prolonged outpatient care with supportive therapy and medication. 20 C.F.R. Pt. 404, Subpt. P, App. 1. Individuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms. Such individuals may be much more impaired for work than their signs and symptoms would indicate. 20 C.F.R. Pt. 404, Subpt. P, App. 1. The results of a single examination may not adequately describe these individuals' sustained ability to function. It is, therefore, vital to review all pertinent information relative to the individual's condition, especially at times of increased stress. 20 C.F.R. Pt. 404, Subpt. P, App. 1. It is mandatory to attempt to obtain adequate descriptive information from all sources which have treated the individual either currently, or in the time period relevant to the decision. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function. 20 C.F.R. Pt. 404, Subpt. P, App. 1. While psychotropic medications may control

certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder. 20 C.F.R. Pt. 404, Subpt. P, App. 1. In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity. 20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission. In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening. Improvement in such impairments that is only temporary will not warrant a finding of medical improvement. 20 C.F.R. § 404.1594 (iv).

The Listing for Affective Disorders is as follows:

> **12.04 Affective Disorders**: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation. The required level of severity for these disorders is met when the requirements in both A and B are satisfied.
>
> A. Medically documented persistence, either continuous or intermittent, of one of the following:
>
> 1. Depressive syndrome characterized by at least four of the following:
> a. Anhedonia or pervasive loss of interest in almost all activities; or
> b. Appetite disturbance with change in weight; or
> c. Sleep disturbance; or
> d. Psychomotor agitation or retardation; or
> e. Decreased energy; or
> f. Feelings of guilt or worthlessness; or
> g. Difficulty concentrating or thinking; or
> h. Thoughts of suicide; or
> i. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:
a. Hyperactivity; or
b. Pressure of speech; or
c. Flight of ideas; or
d. Inflated self-esteem; or
e. Decreased need for sleep; or
f. Easy distractibility; or
g. Involvement in activities that have a high probability of painful consequences which are not recognized; or
h. Hallucinations, delusions or paranoid thinking;

or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);

AND

B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Deficiencies of concentration, persistence or pace resulting in frequent failure to complete tasks in a timely manner (in work settings or elsewhere); or
4. Repeated episodes of deterioration or decompensation in work or work-like settings which cause the individual to withdraw from that situation or to experience exacerbation of signs and symptoms (which may include deterioration of adaptive behaviors).

20 C.F.R. Pt. 404, Subpt. P, App. 1.

An individual may meet the separate Listing for mental retardation if he or she has a valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing additional and significant work- related limitation of function. 20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

**F. <u>Other Work</u>**

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995). In determining whether the

Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989). This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors. 20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987). In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert). It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy. *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989); *Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981). In any event, the ALJ must make a specific finding as to whether the non-exertional limitations are

severe enough to preclude a wide range of employment at the given work capacity level indicated by the exertional limitations. *Foote*, 67 F.3d at 1559.

**1. <u>Pain</u>**

Pain is a non-exertional impairment. *Foote*, 67 F.3d at 1559; 826 F.2d at 1003. Congress has determined that a claimant will not be considered disabled unless he furnishes medical and other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical impairment which could reasonably be expected to produce the pain or symptoms alleged. 42 U.S.C. § 423 (d)(5)(A). The ALJ must consider all of a claimant's statements about his symptoms, including pain, and determine the extent to which the symptoms can reasonably be accepted as consistent with the objective medical evidence. 20 C.F.R. § 404.1528. In determining whether the medical signs and laboratory findings show medical impairments which reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991). Pain alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v. Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability. 42 U.S.C. § 423 (d)(5)(A).

**2. <u>Credibility</u>**

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.

*Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence). A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record. *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986). As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true. *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case. *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982). If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

## V. APPLICATION AND ANALYSIS

### A. The Facts

Born on October 26, 1958, Joslyn was forty-five years old at the time of the ALJ's decision.[2] R. 99. Joslyn has an eleventh-grade education, and his past relevant work experience includes work as a truck driver. R. 471-72. Joslyn claims an inability to work beginning November 30, 2000. R. 99.

[2]He is now forty-six years old.

On August 28, 2000, Joslyn went to Robert S. Roberts, M.D., for an initial visit and evaluation of left wrist pain and numbness. Dr. Roberts noted Joslyn's past medical history of L5 fusion, left elbow surgery for fracture, and left elbow ulnar nerve transposition. Examination of the left wrist showed a positive Tinel's sign, decreased motion, and diminished grip strength. The impressions were left carpal tunnel syndrome and left ulnar neuropathy at elbow. Dr. Roberts administered injections. R. 266-67.

On October 12, 2000, Dr. Roberts performed an endoscopic carpal tunnel release. R. 268-69. One week later, Dr. Roberts noted that Joslyn's surgical wound had healed "nicely." Joslyn stated that his hand had improved, but he complained of pain in his elbow. R. 266. On November 20, 2000, Joslyn reported sensitivity over the incision and numbness in the index finger, but improving strength. Dr. Roberts opined that he would continue to improve with time. R. 266.

On December 12, 2000, Joslyn was admitted to the ER due to irregular heartbeat. He complained of chest pain, pressure, and palpitations. Joslyn stated having a past history of heart murmur, but no history of coronary artery disease or cardiac dysrhythmias. He also stated that he smoked two packs of cigarettes daily. Examination revealed a 2/6 murmur heard over the precordium. An electrocardiogram showed sinus rhythm without acute changes. Chest x-rays showed no acute disease. R. 183-86. On December 13, 2000, Joslyn underwent an echocardiogram. The global left ventrical ejection fraction was normal. There was mild mitral insufficiency and tricuspid insufficiency, and mild to mild-to-moderate aortic stenosis. Joslyn's blood pressure showed pulmonary hypertension. R. 220.

On December 14, 2000, Joslyn underwent an exercise stress test. The results showed normal blood pressure, no arrhythmia precipitated by exercise, and normal results according to EKG and clinical criteria. R. 222. On December 15, 2000, Joslyn underwent chest x-rays. The impression was borderline cardiomegaly and stable chest appearance. Joslyn also had a ventilation lung scan and a pulmonary perfusion scan. The impression showed no deficits. R. 217-18. Bishnu P. Verma, M.D., discharged Joslyn that day with a diagnosis of chest pain, rule out myocardial infarction, and rule out cardiac arrhythmia. Treatment comprised a nitroglycerin patch, and a nicotine patch for Joslyn's history of tobacco abuse. Joslyn was advised to stop smoking. R. 183-86, 251. On December 21, 2000, Joslyn returned to Dr. Verma for a follow-up. He was in no distress. Dr. Verma advised him to finish his antibiotics, quit smoking, and to have a complete physical exam. R. 261-63.

On January 11, 2001, Dr. Roberts noted slow but steady improvements. Joslyn had minimal discomfort and slight numbness in the index finger of the left hand. Despite the numbness, Joslyn stated that he was pleased with the result. Joslyn also stated that he had had a heart attack. Dr. Roberts found that Joslyn had improved significantly, including his strength. He opined that Joslyn had reached maximum medical improvement. R. 266. In a final narrative report dated January 22, 2001, Dr. Roberts concluded that Joslyn had a 5% PPI due to the impairments of his left wrist, and he opined that Joslyn may have continuing discomfort associated with weather and strenuous activities, and may require medication and therapy. R. 264-65.

On March 14, 2001, Joslyn went to Rajendra Hippalgaonkar, M.D., for complaints of generalized aches and pain and fatigue. Joslyn had a grade 2/6 systolic ejection fraction murmur in the aortic area and a grade 2-3/6 diastolic blow in the aortic area. The assessments were congenital

valvular heart, probable bicuspid aortic valve, mild aortic stenosis and moderately severe aortic insufficiency, normal left ventricular function, ejection fraction of 60%, hypertension, and heavy nicotine abuse. Dr. Hippalgaonkar advised Joslyn to stop smoking. R. 337.

On March 26, 2001, Sam Ranganathan, M.D., performed a consultative examination. Initially, Joslyn stated that he needed open-heart surgery, but after Dr. Ranganathan questioned him, Joslyn conceded that he simply had an appointment with Dr. Hippalgaonkar. Joslyn stated that he smoked two packs of cigarettes for thirty years. He complained of daily headaches and constant pain radiating into his hip. Lower extremity strength was 3 to 4/5. Regarding range of motion of the thoracolumbar spine, Joslyn's forward flexion was reduced by five degrees, and extension was diminished two degrees. Sensory system examination revealed decreased sensation to touch in the left leg in a patchy distribution. The assessments were history of heart murmur, continuous nicotine dependence, lumbosacral spine surgery, and degenerative joint disease of the lumbosacral spine. R. 276-77, 280.

On April 3, 2001, state agency physician M. de la Cerna, M.D., performed a Residual Functional Capacity Assessment. Dr. de la Cerna determined that Joslyn could lift/carry twenty pounds occasionally, ten pounds frequently, sit/stand/walk for six hours, and had unlimited pushing/pulling ability. Joslyn was to avoid concentrated exposure to fumes, odors, dusts, gases and poor ventilation. According to Dr. de la Cerna, Joslyn had no other functional limitations. R. 297-304.

On May 3, 2001, Joslyn went to James K. Shea, M.D., for complaints of pain in his left wrist and hand, left knee, neck, and bilateral trapezius. Joslyn stated that his constant pain caused depression and sleeplessness. Dr. Shea made no clinical findings and prescribed medication. R. 306.

On June 12, 2001, Joslyn returned to Dr. Shea for left wrist pain, moderate-to-severe pain in the left knee, neck pain, sleeplessness due to pain, and numbness in his left arm when sleeping on the left side. Dr. Shea made no clinical findings and prescribed medication. R. 305.

On October 26, 2001, Alan Barber, M.D., performed a consultative examination for disability purposes. Joslyn alleged that he was depressed, had decreased memory, and problems with his heart, lungs, and left arm. He stated that he could not work due to his leaking, clogged, and enlarged heart valve. Regarding his depression, Joslyn stated that in December 2000, Dr. Verma diagnosed him with depression and myocardial infarction.[3] He stated that he was advised to stop smoking, but continued to smoke three packs of cigarettes daily for thirty years. Joslyn also stated that he had two heart attacks. Physical examination revealed a murmur SEM 3/6 at the left sternal border, positive radial pulse bilaterally in the wrists, positive left sign of carpal tunnel impingement, positive Phalen's sign, and positive Tinel's sign.[4] Joslyn had normal muscle and grip strength in the upper extremities, normal range of motion of upper extremities, but decreased range of motion of the lower extremities and back.

Mental status examination revealed flat effect and evidence of depression, but Joslyn was alert, oriented to time, place, and person, and had no memory deficit or suicidal ideation. The impressions were depression, left carpal tunnel impingement, status post-myocardial infarction, tobacco abuse, history of lumbar disc pathology with degenerative joint disease, and SEM murmur. Dr. Barber opined that Joslyn would be unable to walk, sit, or stand for long periods without complaints of pain,

---

[3]The record does not reflect any such diagnosis or treatment by Dr. Verma. In fact, Dr. Verma specifically ruled out myocardial infarction. R. 376.

[4]A sensation of tingling or pins and needles. STEDMAN'S MEDICAL DICTIONARY 1640 (27th ed., 2000).

and that he was limited to activities not requiring long periods of standing, and possibly requiring use of upper body movements and coordinated hand activities. R. 307-12.

On November 2, 2001, David Zelbovitz, Psy.D., performed a consultative examination. Joslyn stated that he could not afford medication, and denied having undergone mental health treatment of any kind. He also stated that he had a heart attack in December 2000. Dr. Zelbovitz rated Joslyn's concentration and memory as fair to good. Joslyn had depressed mood and affect, but no evidence of hallucinations, delusions, illogical thought processes, or a formal thought disorder. His appetite and sleep patterns were disturbed, and he performed no daily living skills. The diagnosis was moderate major depressive disorder, and his prognosis was guarded. Dr. Zelbovitz recommended mental health treatment and medication. R. 313-14.

On November 15, 2001, state agency physician Violet A. Stone, M.D., performed a Residual Functional Capacity Assessment. She determined that Joslyn could lift/carry twenty pounds occasionally, ten pounds frequently, sit/stand/walk for six hours, had unlimited pushing/pulling ability, and could occasionally stoop and crouch. Joslyn had no other functional limitations. R. 315-22.

On November 29, 2001, state agency physician Jeffrey L. Pricket, Psy.D., completed a Psychiatric Review Technique form. Dr. Pricket determined that Joslyn had an affective disorder, but no severe impairments. He found that Joslyn had mild restrictions on activities of daily living, maintaining social functioning, and in maintaining concentration, persistence or pace. Joslyn had no other functional limitations. R. 333.

On January 24, 2002, Narinder S. Aujla, M.D., performed a consultative examination for Joslyn's right-sided neck pain. Cervical spine examination revealed tenderness in right paraspinal

cervical area. Joslyn experienced discomfort in attempting extension at fifteen degrees. Flexion was at forty-five degrees bilaterally. Reflexes were 1/3 bilaterally. The right shoulder was weak on external rotation. There was no motor weakness of the upper extremities, and grip strength was excellent. The diagnosis was right cervical radiculopathy. R. 416. On January 25, 2002, an MRI of the cervical spine showed minimal disc bulges and mild degenerative disc disease at C5-6 and C6-7, and no spinal canal stenosis. R. 418.

On January 31, 2002, Joslyn returned to Dr. Aujla for pain in his neck and right shoulder. Examination showed good range of motion of the cervical spine, no motor weakness or sensory deficit of the upper extremities, excellent grip strength, localized tenderness of the right shoulder rotator cuff insertion, no weakness in external rotation, and mild impingement. The impression was right rotator cuff impingement and cervical spondylosis. Dr. Aujla noted that Joslyn felt much better after receiving an injection. R. 431.

On January 20, 2003, Joslyn was admitted to the hospital for chest pain. He described having constant chest pain radiating to the right neck and lower extremity, shortness of breath, and diaphoresis. A chest x-ray showed no acute disease. The diagnoses were chest pain, rule out myocardial infarction, hypertension, polysubstance abuse. R. 375-76, 381. An electrocardiogram performed on January 21, 2003 revealed ejection fraction of 54%, sclerotic and calcified aortic valve, moderate aortic insufficiency, and no evidence of mitral valve or prolapse. R. 357. On January 23, 2003, a stress test showed good left ventricular function with ejection fraction of 52%, and no significant changes compared to a previous study from December 2000. R. 379.

On February 18, 2003, Joslyn went to Peter H. Oostwouder, M.D., for complaints of right shoulder pain, body pain, and migraines. Joslyn stated that he could not afford his medication. R. 432. On March 6, 2003, he complained of increased low back pain and right shoulder pain. R. 434. Joslyn returned on March 17, 2003, with continued right shoulder pain and an inability to afford medication. The diagnosis was tendonitis of the right shoulder. R. 433. On April 14, 2003, Joslyn complained of extreme low back pain and leg pain. R. 436. On May 20, 2003, Joslyn complained of continuing back pain and an inability to afford medication. Straight leg raise was positive bilaterally. On June 10, 2003, Joslyn was diagnosed with chronic back pain and tendonitis of the shoulder. R. 440.

On July 3, 2003, Joslyn complained of back pain, tingling in the legs, and tightness. Examination revealed a 3/6 heart murmur. The diagnoses were chronic back pain and spasm. R. 442. Joslyn returned with right shoulder and back pain on July 31, 2003. The right shoulder was swollen at the joint, and he had pain with range of motion and tenderness of the back. The diagnoses were chronic back pain and shoulder degeneration. R. 441. On August 27, 2003, Joslyn complained of migraines, but stated that his shoulder felt better. R. 443. On September 24, 2003, Joslyn complained of daily headaches and shoulder pain. R. 444.

On October 6, 2003, Joslyn returned to Dr. Aujla for complaints of right shoulder pain. He reported that physical therapy had helped him, and that he sometimes had pain in the side of his neck and localized in the shoulder. Examination showed 110 degrees of abduction and forward flexion. Dr. Aujla noted that Joslyn’s progress was slow. On October 14, 2003, an MRI of the right shoulder

showed no tear of the rotator cuff, and mild-to-moderate hypertrophy at the acromioclavicular joint creating mild impingement syndrome. R. 420-22.

In a letter dated November 4, 2003, Dr. Hippalgaonkar wrote to Joslyn's attorney that he last treated Joslyn in March 2001, and that Joslyn had congenital valvular heart disease involving the aortic valve, with evidence of mild degree of aortic stenosis and moderately severe aortic regurgitation, with normal left ventricular functioning. Dr. Hippalgaonkar had advised Joslyn to quit smoking, continue medications, and suggested that if his symptoms persisted, he would require prognostic, diagnostic catheterization and possible aortic valve replacement. R. 446.

**B. <u>The Analysis</u>**

**1. The Evidence Does Not Show a Severe Mental Impairment.**

Joslyn argues that the ALJ erred by failing to find that he has severe mental impairments. Joslyn is wrong, as there is minimal medical evidence reflecting treatment of mental impairments. The record comprises medical records dating from about August 2000 through at least November 2003. During this 40-month period, Joslyn complained of (or received consultation/treatment for) mental symptoms on just four occasions: May 2001, October 2001, and twice in November 2001. In May 2001, Dr. Shea, a two-time treating source, prescribed Zoloft but made no clinical findings. In October 2001, Dr. Barber, a non-examining consultative source, diagnosed Joslyn with depression. In November 2001, Dr. Zelbovitz, an examining consultative source, diagnosed Joslyn with major depressive disorder. Finally, Dr. Pricket, a non-examining consultative source, found that Joslyn had only an affective disorder and no severe mental impairments. There are no other records relevant to mental impairments.

Joslyn relies on Dr. Zelbovitz' diagnosis of major depressive disorder to support his argument that Joslyn had a severe mental impairment. Dr. Zelbovitz' opinion, however, is not consistent with the evidence which shows no functional limitations from Joslyn's mental impairments. Dr. Zelbovitz' impressions were based, in part, on Joslyn's self-serving description of his condition, and his complaints were exaggerated. Specifically, Joslyn told Dr. Zelbovitz that he had had two heart attacks in December 2000 and January 2002, when in fact, heart attacks had been ruled out. In addition, notwithstanding Dr. Zelbovitz' diagnosis of major depressive disorder, he did not find that the condition interfered with Joslyn's ability to do basic work activities. In fact, none of Joslyn's other physicians reach such a conclusion. Dr. Pricket determined that Joslyn's affective disorder resulted in merely mild restrictions on activities of daily living, social functioning, and concentration, persistence, or pace. Thus, at best, the evidence shows sporadic treatment for mental impairments, but no longitudinal treatment.

Moreover, even if Joslyn's mental impairment was severe, Joslyn has failed to establish that his mental condition prevented him from performing other work. The exclusion of a condition at step two of the sequential evaluation process matters only if the condition caused relevant functional limitations. The evidence shows that Joslyn's condition caused no relevant functional limitations. Therefore, even assuming that the ALJ erred by failing to find that Joslyn had a severe mental impairment, such error was harmless. The evidence supports a finding that Joslyn has no severe mental impairments.[5]

---

[5]Joslyn also argues that the ALJ failed to order a consultative examination to confirm the extent of Joslyn's psychological impairments. The Court disagrees. The record contained sufficient evidence regarding Joslyn's impairments for the ALJ to render her decision. Joslyn bears the ultimate burden of proving disability, and failed to furnish medical

(continued...)

**2. Substantial Evidence Does Not Support Joslyn's Allegations of Disabling Pain.**

Next, Joslyn contends that the ALJ failed to properly evaluate Joslyn allegations of disabling pain. More specifically, Joslyn alleges that he experiences disabling pain due to aortic insufficiency, lumbar fusion/chronic back pain, left carpal tunnel syndrome, and right shoulder pain. Joslyn is wrong. The medical and other evidence shows no medical impairment which could reasonably be expected to produce the pain or symptoms alleged.

The evidence establishes that Joslyn suffers from carpal tunnel syndrome. Joslyn had carpal tunnel surgery in October 2000. By November 2000, Joslyn had improved, and Dr. Roberts, his surgeon, opined that Joslyn would continue to improve. In January 2001, Joslyn stated that he was pleased with the results, and that he had minimal discomfort and slight numbness. Dr. Roberts noted slow but steady improvements, and believed that Joslyn had reached maximum medical improvement, although he had a 5% permanent physical impairment due to his left wrist.

In March 2001, Dr. Ranganathan, an examining consultative physician, found no restrictions in the range of motion of Joslyn's hands. In April 2001, a state agency physician found no manipulative limitations. In May and June 2001, Joslyn sought treatment for wrist pain. In October 2001, Dr. Barber, an examining consultative physician, noted positive Tinel's sign in Joslyn's wrist, but also normal muscle and grip strength. Joslyn had normal grip strength and fine manipulation abilities his left arm. In November 2001, a state agency physician noted no manipulative limitations. In January 2002, Dr. Aujla, an examining consultative physician, found that Joslyn had excellent grip

[5](...continued)
and other evidence sufficient to show functional limitations due to psychological symptoms. Joslyn was represented by an attorney at both administrative hearings, and has failed to carry his burden.

strength. There are no other records reflecting treatment of hand-related symptoms. Thus, after Joslyn's surgery in October 2000, he complained of pain only twice, in May and June 2001. Thereafter, the evidence indicates good strength and range of motion. In sum, the evidence relating to Joslyn's hand and wrist impairment does not support his complaints of totally disabling pain.

Similarly, the evidence regarding Joslyn's aortic insufficiency and heart condition shows minimum symptoms. Joslyn complained of chest pain on about two occasions: December 2000 and January 2003. Diagnostic testing showed no acute disease and ruled out myocardial infarction. In March 2001, Dr. Hippalgaonkar diagnosed Joslyn with a congenital heart condition, mild aortic stenosis, moderately severe aortic insufficiency, and hypertensive cardiovascular disease. In October 2001, Joslyn told Dr. Barber that he had only one episode of chest pain in the prior ten months. Joslyn's lack of treatment for his alleged chest pain between March 2001 and January 2003 and after January 2003 implies an absence of significant limitations associated with his heart impairment.

Regarding Joslyn's back and shoulder pain, the evidence establishes degenerative disc disease and mild impingement of the shoulder. In March 2001, Dr. Ranganathan diagnosed Joslyn with degenerative disc disease. In October 2001, Dr. Barber found a normal range of motion of the upper extremities, but a decreased range of motion of the back. He diagnosed Joslyn with a history of lumbar disc pathology and degenerative disc disease. In January 2002, an MRI of the cervical spine showed merely mild degenerative disc disease. Dr. Aujla found good range of motion of the cervical spine, and rotator cuff impingement. From February 2003 through at least September 2003, Joslyn went to Dr. Oostwounder multiple times for complaints of shoulder and back pain. Treatment was conservative, and an MRI of the right shoulder in October 2003 showed no tear of the rotator cuff and

only mild impingement syndrome. Taken in combination, the evidence establishes that Joslyn has mild impairments of the wrist, back, and shoulder, along with minimal chest pain, but no impairment which could reasonably be expected to produce the symptoms alleged.

Finally, Joslyn argues that the ALJ erroneously discredited Joslyn's testimony on the basis of "misleading or irrelevant medical documentation or testimony." Pl.'s Brief at 14-15. The Court disagrees. The record demonstrates that Joslyn's allegations are not credible. Upon questioning by his attorney at the administrative hearing, Joslyn testified that he had had two heart attacks. But the evidence establishes that although he was hospitalized for chest pain, a myocardial infarction was expressly ruled out. R. 160-74, 340-414. Joslyn's attorney barely corrected Joslyn's testimony at the hearing, stating only that the "work up was negative." R. 469-70.

It was only after the ALJ issued her decision discrediting Joslyn's testimony that Joslyn attempted to resolve the inconsistency. In his brief, Joslyn asserts that he "was clearly using the term 'heart attack' to apply generically to these two hospitalization periods due to chest pain" and that it was "obvious" that Joslyn was not trying to deceive the ALJ because the evidence was before the ALJ. But Joslyn made the same inaccurate representations to three physicians (Drs. Roberts, Barber and Zelbovitz), who may not have had the benefit of Joslyn's medical records. Joslyn's propensity for self-serving embellishment makes his seemingly innocent explanation disingenuous. Contrary to Joslyn's argument that the ALJ discredited Joslyn's testimony based on "misleading or irrelevant medical documentation or testimony," the ALJ understandably discredited Joslyn's testimony based on his own misleading testimony and on relevant medical documentation.

**3. The Hypothetical Questions Were Based on Substantial Evidence.**

Lastly, Joslyn contends that the ALJ posed to the VE hypothetical questions that were not supported by substantial evidence. Joslyn's argument is directed to the limitation in the hypothetical question that Joslyn had to alternate between sitting, standing, and walking. In her first hypothetical, the ALJ asked the VE to assume that an individual is:

> **unable to walk, stand, or sit for prolonged periods**, but he can do so for two hours alternating for an eight hour – for eight hour periods. **In other words, every two hours, he'd have to alternate between the activities.** He cannot lift or carry more than 20 pounds occasionally and 10 pounds frequently.

R. 485 (emphasis added). The VE responded, "I can't come up with [other jobs in the national economy] where he could [sit, stand, walk] at two hour intervals. Sometimes you can sit and stand if you're like in a toll booth, but I don't imagine you can be walking around . . . " R. 485.

The ALJ then clarified that Joslyn did not have to perform *all* three positions, but instead, needed to merely alternate between *some* of those three positions. The ALJ stated "When I say it's a [sic] alternate positions every two hours . . . if he just needs to alternate between those positions, not saying he has to walk every two hours, but he needs to alternate his positions every two hours, so he could alternate between sitting and standing." R. 486. The VE responded that the claimant could perform other work.

Joslyn argues that the ALJ "notably changed" her hypothetical in order to "circumvent the VE's initial response," presumably in an attempt to elicit the response that the ALJ sought. Pl.'s Brief at 10-11. The Court disagrees because the hypothetical questions were, in fact, supported by the evidence. The ALJ determined that Joslyn retained an RFC sufficient to "walk, stand or sit for no more than two hours at a time with the need to alternate positions between activities as needed and

walk on his breaks." R. 23, Finding 7. The ALJ relied on the opinion of Dr. Barber, who determined that Joslyn was "unable to walk, stand and sit for long periods of time without complaints of body pain" and that Joslyn was limited to activities "not requiring long periods of standing." R. 310. In addition, two state agency physicians determined that Joslyn could sit, stand, and walk for six hours in an eight hour day. R. 298, 316. Therefore, the ALJ determined an RFC even more restrictive than found by two state agency physicians and an examining consultative source. Substantial evidence supported the ALJ's hypothetical.[6]

## VI. CONCLUSION

For the reasons stated above, it is **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**. Failure to file written objections to the proposed findings and recommendations in this report pursuant to 28 U.S.C. § 636 (b)(1) and Local Rule 6.02 within ten days of the date of its filing shall bar an aggrieved party from a *de novo* determination by the district court of issues covered in the report, and shall bar an aggrieved party from attacking the factual findings on appeal. Any party appealing this decision shall file and serve a copy of the oral argument transcript within thirty days of this order.

**RECOMMENDED** this 25th day of May, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

[6] Joslyn also asserts — without merit — that the ALJ failed to include in the hypothetical limitations related to Joslyn's mental impairment. As discussed above, however, the evidence does not support a severe mental impairment.

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

The Honorable John Antoon II

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia 30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL 33602

The Honorable Philemina M. Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL 32817